UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ANTOINETTE M. JONES,

                    Plaintiff,

                                                    **MEMORANDUM AND ORDER**
              - against -                              13-CV-4785 (RRM)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
---------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

        Plaintiff *pro se* Antoinette Jones brings this action against defendant the Commissioner of

the Social Security Administration (the "Administration" or "Commissioner"), pursuant to 42

U.S.C. § 405(g), seeking review of defendant's determination that plaintiff is not entitled to

disability insurance benefits under Title II and Title XVI of the Social Security Act ("SSA").

Defendant moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure

12(c).  For the reasons set forth below, defendant's motion is GRANTED.

                          **PROCEDURAL BACKGROUND**

        On June 30, 2010, plaintiff filed an application for supplemental social security income,

alleging disability beginning November 1, 2008.[1]  (Admin. R. (Doc. No. 19) at 73.)  The Social

Security Administration denied the application on November 8, 2010, and plaintiff requested a

hearing on December 15, 2010.  (*Id.*)

        Plaintiff's hearing was held on August 2, 2011.  (*Id.*)  On May 24, 2012, Administrative

Law Judge ("ALJ") Margaret A. Donaghy found that plaintiff was not disabled.  (*Id.* at 82.)  The

Administration's Appeals Council denied plaintiff's request for review on July 25, 2013.  (*Id.* at

---
[1] In plaintiff's complaint, she lists June 30, 2010 as the date that her disability began.  (Compl. (Doc. No. 1) at ¶ 5.)
There are several additional discrepancies between dates in the administrative record and the complaint.  As these
discrepancies appear to be accidental and not representative of a material dispute of fact, the Court relies upon the
dates in the administrative record.

1–5.)  Plaintiff filed the instant complaint in this case on August 23, 2013.  (Compl. (Doc. No.

1).)  The complaint asks the Court to modify the decision of the Commissioner to grant monthly

maximum insurance and/or Supplemental Security Income benefits to the plaintiff, retroactive to

the date of the initial disability, or, in the alternative, to remand to the Commissioner for

reconsideration of the evidence.  (*Id.* at ¶ 9(c).)  The complaint is a form complaint that does not

allege any specific defects in the ALJ's analysis.  (*See generally id.*)

The defendant served notice to plaintiff of its motion for judgment on the pleadings on

April 7, 2014, requesting a written response by May 7, 2014.  (April 7, 2014 Appleton Letter

(Doc. No. 13).)  Plaintiff did not respond, and on May 30, 2014, defendant requested leave to file

its motion for judgment on the pleadings.  (May 30, 2014 Appleton Letter (Doc. No. 14).)  On

June 2, 2014, the Court ordered plaintiff to serve her papers by June 16, 2014, and warned

plaintiff that failure to do so would result in the Court considering defendant's motion on default.

(Order, June 2, 2014.)  Plaintiff never responded, and defendant filed its motion on June 23,

2014.  The Court now considers defendant's motion on its merits.[2]

## FACTUAL BACKGROUND

### I.     Non-Medical Evidence

#### A.  Employment History and Documentary Non-Medical Evidence

Plaintiff was born on February 21, 1968.  (Admin. R. at 194.)  She has a high school

education.  (*Id.* at 199.)  Plaintiff worked as a home health aide from 1991 until 2001, when she

quit to prepare for an out-of-state move.  (*Id.* at 93.)  Plaintiff did not resume working except for

---

[2] Although plaintiff's motion is unopposed, the court may not *grant* the motion by default. *McDowell v. Comm'r of Soc. Sec.*, No. 08-CV-1783 (NGG), 2010 WL 5026745, at *1 (E.D.N.Y. Dec. 3, 2010).  As with a motion for summary judgment, "where there is a fulsome record of the underlying administrative decision," the Court must review the record to determine "whether the moving party has established that the undisputed facts entitle it to judgment as a matter of law." *Martell v. Astrue*, No. 09-CV-1701 (NRB), 2010 WL 4159383, at *2 (S.D.N.Y. Oct. 20, 2010) (citing *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004)).  The Court may, however, accept the movant's factual assertions as undisputed. *Vt. Teddy Bear Co.*, 373 F.3d at 246.

two to three months in 2003 or 2004, and again in 2008, because her son was sick with asthma. (*Id.* at 94.) In 2008, she again stopped working because of hip pain. (*Id.* at 92–93, 198.)

According to a disability report prepared in June 2010 by plaintiff's case manager, Atiya Dozier, plaintiff suffered from osteoarthritis, hypertension, a left hip fracture, and slipped capital femoral epiphysis ("SCFE"), a hip disorder. (*Id.* at 198.) In 1979, at age twelve, plaintiff had surgery for her SCFE. (*Id.* at 201.) Plaintiff reported that due to the osteoarthritis in her hip, she could not lift heavy objects, squat, kneel, or bend, or stand, walk or sit for long periods of time. (*Id.* at 203.)

Around the same time, Dozier also completed a function report on plaintiff's behalf. (*Id.* at 205–14.) Plaintiff reported that her daily routine involved getting up in the morning, taking her son to school, attending a substance abuse program, returning home to relax, picking up her son, and then relaxing for the rest of the day. (*Id.* at 205.) Plaintiff reported walking and taking public transportation to take her son to school. (*Id.* at 208.) The case worker's report states both that plaintiff shopped for food on a "daily" and "monthly" basis. (*Id.* at 208.) Plaintiff also reported that she could work, cook, clean, and take care of her son "to the fullest degree." (*Id.* at 206.) Plaintiff reported no problems attending to her personal care or handling finances. (*Id.* at 206, 208–09.) She also assisted her son with his homework. (*Id.* at 209.) Plaintiff cooked for herself three to four times per week, but she generally cooked quick meals because she could not stand for long periods of time, and cooked less frequently than before her conditions began. (*Id.* at 207.) Plaintiff reported suffering from severe pain at night that affected her sleep. (*Id.* at 206.) The only daily household chore that plaintiff did was to make her bed. (*Id.* at 207.) She reported being able to walk about half a block before requiring a rest for five to six minutes. (*Id.* at 210.) Plaintiff walked with a cane, which her primary care physician, Dr. Vanessa Jeffers,

prescribed in 2009.  (*Id.* at 212.)  As to plaintiff's psychological condition, the case manager reported that plaintiff paid attention long enough to answer and understand everything that was stated and explained to her, had no problems with authority figures or handling stress or changes in routine, that she "followed all written consents that was asked of her during the initial intake," and followed all written instructions as requested by the case manager.  (*Id.* at 211–12.)

Plaintiff completed questionnaires on July 18, 2010 and August 5, 2010.  (*Id.* at 238–43.) In them, plaintiff stated that she first started experiencing pain in 2008, and that it began to affect her activities in 2008 or the beginning of 2009.  (*Id.* at 238.)  She described her pain as a "constant," "sharp, ache" in her "lower back, left and right hip" that radiates down her left leg. (*Id.*)  "Walking, sitting, bending, lifting, squatting, standing, [or] climbing stairs" brings on the pain every day and at night.  (*Id.*)  The pain lasts until she takes her medication, which includes both prescription medication, which makes her sleepy, and non-prescription medication.  (*Id.* at 239.)  Plaintiff stated that she uses her cane every day, even at home, and doesn't socialize unless visitors come to her or she gets a car ride.  (*Id.*)  She also stated that she gets help from friends and family for shopping and household chores, and "cannot work, shop or go places for a long period of time."  (*Id.*)

On December 7, 2010, a different case manager, Rachel Buissereth, completed a second function report.  (*Id.* at 449–56.)  Plaintiff told Buissereth that she would rise as early as 4:00 a.m. to get ready to take her son to school, and that when she was not physically well, a friend would do it for her.  (*Id.* at 449.)  Plaintiff also stated that she reads at night if she able to concentrate long enough.  (*Id.*)  Despite being exhausted, plaintiff is unable to fall asleep.  (*Id.*) Plaintiff stated that she used to be able to prepare hot meals, maintain employment, and spend time with others, but that her hip fracture worsened over the years, and she could no longer do

these things.  (*Id.* at 450.)  She described the frequency and duration of meal preparation as ten to fifteen minutes, twice a week.  (*Id.* at 451.)  Buissereth's report differs from Dozier's report in that it does not include public transportation as one of plaintiff's modes of transportation, instead stating that she utilizes "access-a-ride," New York City's public paratransit system for people with disabilities.[3]  (*Id.*)  The report notes that a family member picks up plaintiff and takes her grocery shopping once a month and that grocery shopping takes plaintiff one to two hours.  (*Id.* at 452.)  Plaintiff also told Buissereth that she stayed home unless attending scheduled appointments and had no desire to speak to others.  (*Id.* at 453.)

As to plaintiff's mental state, she told Buissereth that she had difficulty paying attention due to the pain in her hips.  (*Id.* at 454.)  When plaintiff encountered stress, she experienced "sadness, frustration, anger, emotional withdrawal, isolation[, and] . . . violent feelings."  (*Id.* at 454.)  Plaintiff stated that changes in routine brought about by her pain and limited ambulation caused her to experience frustration and anger.  (*Id.*)  The report also noted that plaintiff was seeing a psychiatrist who prescribed medication for anxiety and depression.  (*Id.* at 456.)

**B.  Hearing Testimony**

**i.      Plaintiff**

At the ALJ hearing held on August 2, 2011, plaintiff testified that she was unable to work due to arthritis in both hips and a bulging disk in her back.  (*Id.* at 94.)  Plaintiff described her hip problems as starting when she was thirteen years old, around the time she was diagnosed with SCFE.  (*Id.* at 104.)  Her SCFE required having her hip surgically pinned in place, and her hip has since deteriorated.  (*Id.*)  Plaintiff testified that one of her doctors recommended she undergo a left hip replacement, and that another had been administering pain injections for her back,

---

[3] NYC Mayor's Off. for People with Disabilities, *Access-A-Ride*, http://www.nyc.gov/html/mopd/html/resources/trans_aar.shtml (last visited Sept. 4, 2015).

ultimately with little positive effect.  (*Id.* at 95, 105).  Plaintiff also stated that she had undergone eight weeks of physical therapy, but that too had little positive effect on her daily pain.  (*Id.* at 94.)  Plaintiff stated that she could sit comfortably for three to four hours during an eight-hour day if given the opportunity to occasionally stretch.  (*Id.* at 105.)  However, she was unable to walk for more than a half block without resting, (*id.* at 97), could only stand for periods of fifteen to twenty minutes at a time, (*id.*), could only lift around five pounds, (*id.* at 98), and required help bathing and dressing due to difficulty in bending over, (*id.* at 100).  When asked by her attorney whether she could physically perform a desk job, she testified that she could not "because I can't stay in one position."  (*Id*. at 106.)

As to her mental state, plaintiff testified that she had long been dealing with "[d]epression, anxiety, and several phobias" but had not begun treatment for those issues until December 2010, at which point she began seeing a psychiatrist once a month and a counselor for therapy once a week.  (*Id.* at 96.)  Plaintiff also testified that she often had trouble sleeping due to anxiety and that she got "panicky" around people, sometimes experiencing two or three panic attacks in a single day.  (*Id.* at 102–03.)  Plaintiff further described having regular nervousness, problems with her memory and focus, issues with her self-confidence, a general lack of energy, and an inability to socialize with people beyond her own family.  (*Id.* at 101–03.)  When asked about her concentration issues, plaintiff testified, "I can't concentrate because there's a lot of things going – when I try to concentrate there's a lot of other things coming at me."  (*Id*. at 99.)  She stated that she often forgets things and does not finish tasks.  (*Id.*)  In discussing the variety of medications prescribed to her for these issues, plaintiff stated that the medications did not help much, but made her drowsy and nervous.  (*Id*. at 97, 103.)  Plaintiff also testified that she received treatment for alcohol abuse, but had not drunk alcohol any since being admitted to her

treatment program in January 2010.  (*Id.* at 98.)  Plaintiff was discharged from that program in November 2010.  (*Id.* at 98.)

### ii.    Vocational Expert Andrew Vaughn

Vocational expert ("VE") Andrew Vaughn also testified at the hearing.  (*Id.* at 106–12.) The ALJ asked Vaughn to consider a hypothetical individual with plaintiff's age, education, and work experience, who could occasionally carry twenty pounds and frequently carry ten pounds, who could sit for one to four hours per day, stand for one hour at a time up to two hours per day, and walk for one hour at a time up to two hours per day with the aid of a cane.  (*Id.* at 107–08.) The hypothetical individual could also occasionally climb, balance, stoop, kneel, crouch, and crawl, but should not climb ladders, ropes, or scaffolds, and should avoid unprotected heights, moving machinery, and operating motor vehicles.  (*Id.* at 108.)  Vaughn testified that such a person could not perform plaintiff's past work as a home health aide, but could perform sedentary work as an addressing clerk, an order clerk, or a callout operator.  (*Id.*)  In total, there were more than 370,000 such jobs nationally and more than 8,000 such jobs in the local economy.  (*Id.* at 108–09.)  However, none of these jobs would be available to an individual with difficulty sustaining concentration or attention for two hours at a time and who would be off-task twenty percent of the time.  (*Id.* at 109.)

### II.    Medical Evidence Presented to the ALJ

#### A.  Physical Health

##### 1.  Dr. Vanessa Jeffers

Dr. Vanessa Jeffers was plaintiff's primary care doctor from 2005 until at least 2010, the last date of contact between plaintiff and Dr. Jeffers appearing in the record.  (*Id.* at 201.)  She prescribed plaintiff medication for hypertension and pain relief and a cane for her gait.  (*Id.* at

201, 212).  On December 9, 2009, Dr. Jeffers ordered x-rays of plaintiff's pelvis and spine.  (*Id.* at 271–72.)  The pelvic x-ray revealed "[s]evere osteoarthritic changes . . . present in the left hip and moderate to severe on the right hip," leading to an impression of "[n]onunion of the left interochanteric fracture."  (*Id.* at 271.)  The spinal x-ray revealed "[m]ild multi-level facet and discogenic degenerative change," but "[n]o obvious acute osseous abnormality."  (*Id.* at 27.)  Dr. Jeffers referred plaintiff for physical therapy at the Brooklyn Hospital center, which plaintiff attended from December 9, 2009 until January 16, 2010, after which she was discharged because she stopped going to therapy.  (*Id.* at 520.)  During that period, plaintiff appears to have shown significant improvement, reporting her pain as a "2/10" after initially having described it as a "9/10."  (*Id.* at 526–33.)

### 2.  Dr. Ronald Chase

On January 8, 2010, Dr. Jeffers referred plaintiff to orthopedic surgeon Dr. Ronald Chase to evaluate plaintiff's bilateral hip pain.  (*Id.* at 270.)  On March 8, 2010, Dr. Chase examined plaintiff's back and hip.  (*Id.* at 264–65.)  After determining that plaintiff had a limited range of motion in her hips, Dr. Chase suggested that plaintiff's ability to work would depend on the extent that she would be expected to move and/or stand.  (*Id.* at 264.)  Dr. Chase concluded that plaintiff was "employable with work limitations," insofar as she "may need frequent breaks if [the] work requires standing."  (*Id.*)  Dr. Chase's prognosis included use of a cane, continued pain management, and reference to a hip specialist. (*Id.*)

### 3.  Dr. Fazil Hussain

On March 30, 2010, Dr. Fazil Hussain, an orthopedist, evaluated plaintiff's mobility issues on behalf of the Wellness, Comprehensive Assessment, Rehabilitation and Employment

("WeCARE") program.[4]  (*Id.* at 430.)  He reviewed Dr. Chase's March 8, 2010 report and concluded that plaintiff was capable working at a sedentary desk job which required minimal walking, standing, climbing, and kneeling, and no high impact activities or carrying weights greater than ten pounds.  (*Id.*)  On April 6, 2010, plaintiff initialed a form acknowledging Hussain's determination and agreeing to participate in the employment rehabilitation program.  (*Id.* at 274–79.)

### 4.  Dr. Paul Pipia

On July 26, 2010, Dr. Paul Pipia, a physical medicine and rehabilitation specialist with WeCARE, met with plaintiff to conduct a functional assessment.  (*Id.* at 296–300.)  Dr. Pipia observed tenderness over the left hip and lower back, a limited range of motion of the left hip, and occasional weakness in the left leg.  (*Id.* at 296.)  He opined that plaintiff's pain was caused by degenerative changes to her hip since her surgery at age thirteen.  (*Id.* at 297.)  He concluded that plaintiff could sit, stand, and walk each for up to one-half hour continuously and for a total of four hours in an eight-hour work day.  (*Id.* at 298.)  However, Dr. Pipia also concluded that prolonged standing, walking, or weight bearing would worsen the wear and tear on plaintiff's joints.  (*Id.*)  He concluded that plaintiff could perform a job that involved occasional reaching, but could never bend, squat, climb, or use her legs or feet for repetitive movements.  (*Id.*)  He noted no limitations on using arms and hands for repetitive actions and that plaintiff could occasionally lift up to 10 pounds and carry up to 5 pounds.  (*Id.* at 298–99.)  Dr. Pipia further assessed that plaintiff could not travel on a daily basis by bus or subway due to resulting pain.  (*Id.* at 299–300.)  His prognosis for plaintiff was "good after repeat surgery."  (*Id.* at 298).

---

[4] WeCARE is a program of the New York City Human Resources Administration that "addresses the needs of cash assistance clients with medical and/or mental health barriers to employment by providing customized assistance and services to help them achieve their highest levels of self-sufficiency."  FEDCAP, *WeCARE*, http://www.fedcap.org/content/wecare (last visited Sept. 4, 2015.)

### 5. Dr. Sanjeev Agarwal

Dr. Sanjeev Agarwal, a specialist with SUNY Downstate Medical Center, examined and treated plaintiff on multiple occasions. On August 3, 2010, he conducted a physical examination of plaintiff. (*Id.* at 458.) Plaintiff rated her pain as a "9/10" at the time. (*Id.*) Dr. Agarwal diagnosed plaintiff with lumbosacral spondylosis and lumbar radiculopathy. (*Id.* at 459.) He noted plaintiff's antalgic gait on the left side, that she could not heel or toe walk, and that she had difficulty climbing onto the examination couch. (*Id.*) He also noted muscle and joint tenderness and a limited range of motion due to hip pain. (*Id.*) Dr. Agarwal also reviewed plaintiff's 2009 x-ray, "which revealed minimal osteophytes and anterior endplates of vertebral bodies." (*Id.*) He recommended that plaintiff return in two months and ordered a CT scan of her lumbar spine in the interim. (*Id.*; *see also id.* at 484 (results of CT Scan)). He also recommended that plaintiff continue physical therapy and taking medication for pain. (*Id.* at 459.)

On September 22, 2010, plaintiff met with Dr. Agarwal for a follow-up. Plaintiff rated her pain as a "7/10" this time. (*Id.* at 461.) Dr. Agarwal diagnosed plaintiff with lumbosacral spondylosis again and left hip degenerative joint disease ("DJD"). (*Id.* at 462.) Dr. Agarwal again noted plaintiff's antalgic gait and that plaintiff could not heel or toe walk. (*Id.* at 461.) Dr. Agarwal recorded muscle strength as a "5/5," except for the left hip flexion, "which is a 3+ to 4-/5 secondary to pain or weakness." (*Id.*) Dr. Agarwal recommended plaintiff continue physical therapy, noting that plaintiff "has only gone to one session so far secondary to transportation reasons." (*Id.* at 461–62.)

October 26, 2010, plaintiff followed up with Dr. Agarwal again. Dr. Agarwal noted that plaintiff stated "she is doing much better," and that plaintiff rated her pain as a "5/10." (*Id.* at 463.) She was also not ambulating with her cane that day. (*Id.*) Dr. Agarwal noted that plaintiff

had "only completed approximately four sessions of physical therapy so far." (*Id*.) Dr. Agarwal also conducted a physical examination, noting that plaintiff could toe and heel walk this time, though with difficulty due to pain. (*Id*. at 464.) Dr. Agarwal also noted that plaintiff's range of motion was still limited secondary to pain. (*Id*. at 463.) Manual muscle testing was a "5/5 . . . except for left hip flexion," which was again "3+ to 4-/5 secondary to pain/weakness." (*Id*. at 463–64.)

Dr. Agarwal also reviewed the results of the lower back CT scan that he had previously ordered. (*Id.* at 464.) He observed "multilevel severe facet arthropathy, mild-to-moderate canal narrowing . . . on the basis of broad-based disc bulges . . . severe bilateral neuroforaminal narrowing . . . moderate-to-severe bilateral foraminal [illegible]. . . and moderate foraminal stenosis." (*Id*.) Dr. Agarwal stated, "[a]s the patient has only received four sessions, I believe that she needs to continue additional therapy sessions to obtain maximal benefits." (*Id*.) He also advised plaintiff to continue following up with Dr. Pipia, taking her pain medication, and to consider weight loss. (*Id*.) He planned to see plaintiff again in approximately two months' time. (*Id*.)

Plaintiff did not see Dr. Agarwal again until March 31, 2011, at which point she reported that her condition had progressively worsened since her last visit. (*Id*. at 465.) She rated her pain as a "9/10" again. (*Id*.) Upon physical examination, Dr. Agarwal diagnosed plaintiff with lumbosacral spondylosis, left hip DJD secondary to a history of SCFE, "left SI joint dysfunction," and degenerative disc disease. (*Id*.) He noted limited range of motion of the lumbar spine due to pain. (*Id.*) He also noted that plaintiff was again unable to demonstrate heel or toe walking. (*Id*.) Dr. Agarwal recommended joint injections, a review of medications, and a follow up two weeks after the injections. (*Id*. at 466.)

In a "Medical Source Statement" dated July 14, 2011, Dr. Agarwal stated that plaintiff could occasionally lift and carry up to twenty pounds, could sit, stand, and walk for one hour at a time, could sit for four hours in an eight-hour work day; and could stand and walk for two hours per work day.[5] He noted that these limitations were present before June 30, 2010, the date of plaintiff's disability application. (*Id*. at 472.)

### 6. Dr. Jerome Caiati

Dr. Jerome Caiati performed a consultative examination of plaintiff on September 28, 2010. (*Id*. at 323–26.) He diagnosed plaintiff with obesity, hypertension, history of heart murmur, left hip fracture, arthritis, depression, history of substance abuse, decreased range of motion of the right knee, and lower back pain. (*Id*. 325–26.) He described her gait as minimal. (*Id*. at 324.) He noted that she could walk on heels and toes with mild difficulty, needed no help changing for the exam or getting on and off the exam table, and, although she complained of pain on her left side, could rise from the chair with minimal difficulty. (*Id*.) He noted limited range of motion with respect to the lumbar spine and the left hip due to pain and full range of motion in her shoulders, elbows, forearms, and wrists. (*Id*. at 324–25.) He rated her strength in her extremities a "5/5." (*Id*.) With respect to the plaintiff's decreased range of motion, Dr. Caiati provided no prognosis. (*Id*. at 326.) With respect to the left hip fracture and arthritis, Dr. Caiati's prognosis was "guarded." (*Id*.) In his Medical Source Statement, Dr. Caiati stated that plaintiff's sitting, reaching, pushing, and pulling were unrestricted, that her standing, walking, bending, and climbing were minimally-to-mildly limited due to left hip and lower back pain, and that her lifting was mildly limited due to left hip and lower back pain. (*Id*.)

---

[5] Although the name of the signing physician is faded and illegible, both defendant and the ALJ assert that Dr. Agarwal's provided the report. (Admin. R. at 472; *see also id*. at 79; Def.'s Mem. in Supp. at 30.) As plaintiff has not responded to defendant's motion, this fact is undisputed.

### B. Mental Health

#### 1. Dr. Michelle Bornstein

Dr. Michelle Bornstein provided a consultative examination of plaintiff on September 28, 2010.  (*Id.* at 329–32.)  After completing a psychiatric evaluation, Dr. Bornstein diagnosed plaintiff with moderate major depressive disorder and alcohol dependence in remission.  (*Id.* at 331.)  Dr. Bornstein's stated that plaintiff's prognosis was "fair to guarded."  (*Id.* at 332.)  Dr. Bornstein noted that plaintiff "endorses depressive symptoms including dysphoric moods, crying spells, loss of usual interests, irritability, and social withdrawal."  (*Id.* at 329.)  She described plaintiff's affect as "dysphoric and mildly irritated" and her mood as "dysthymic."  (*Id.* at 329–30.)  She also noted, however, that "there is no evidence or report of anxiety, panic attacks, manic symptoms, thought disorder symptoms, or cognitive deficits."  (*Id.* at 329.)  In the mental status portion of the examination, Dr. Bornstein observed that plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate.  (*Id.* at 330.)  She noted that plaintiff's thought processes were coherent and goal-directed and that her attention, concentration, and recent and remote memory skills were intact.  (*Id.* 330–31.)  Dr. Bornstein estimated that plaintiff's cognitive functioning fell into the low average range at the lowest and that her insight and judgment were fair.  (*Id.* at 331.)

In her "Medical Source Statement," Dr. Bornstein opined that plaintiff could follow and understand simple directions and instructions, and that she could perform simple tasks independently.  (*Id.*)  Dr. Bornstein also opined that plaintiff could maintain attention and concentration, maintain a regular schedule, and learn new tasks, although she might need supervision for complex tasks.  (*Id.*)  Finally, she opined that plaintiff "can make appropriate

decisions, relate adequately with others, and appropriately deal with stress." (*Id*.) Dr. Bornstein recommended a psychiatric evaluation and individual psychological therapy. (*Id*. at 332.)

### 2. Dr. Y. Burstein

Dr. Y. Burstein, a State Agency Medical consultant, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment of plaintiff on October 19, 2010. (*Id*. at 333–50.) In his review and assessment, Dr. Burstein noted that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, but was not significantly limited otherwise. (*Id*. at 347–48.) Dr. Burstein also noted mild limitations for activities of daily living, maintenance of social functioning, and maintenance of concentration, persistence, or pace, as well as one or two repeated episodes of deterioration, each of extended duration. (*Id*. at 343.)

Dr. Burstein opined that the plaintiff's activities of daily living pointed "to a self-reliant individual who has the capacity to perform various chores." (*Id*. at 349.) He also opined that Dr. Bornstein's medical source statement reflected no marked limitations from a psychological perspective. (*Id*.) She noted that while plaintiff presented evidence from medical professionals that "is partially consistent with [plaintiff's] allegations of depressive symptoms, the [medical examination record] . . . is not consistent with any claim of marked psychological limitations" and plaintiff's "complaints are not considered to be significantly limiting." (*Id*.) She opined that plaintiff is capable of understanding and following directions and sustaining concentration for tasks and that she is able to adapt to changes as well as relate adequately to others. (*Id*.)

### 3.   Dr. Lev Poberesky

Plaintiff saw Dr. Lev Poberesky, a psychiatrist at Interborough Developmental and Consultation Center ("Interborough"),[6] for a series of medication management sessions in 2010 and 2011.  (*See id.* at 488–503.)  Dr. Poberesky completed an initial psychiatric evaluation on October 27, 2010.  (*Id*. at 500.)  He listed plaintiff's chief complaints as anxiety, depression, and low energy.  (*Id*.)  In the mental status portion of the examination, he marked plaintiff as "[c]ooperative" and displaying "[a]ppropriate" mannerisms.  (*Id.* at 502.)  He also marked her thought process as "[a]ppropriate (rational/coherent)" and checked a box indicating that there was no thought or perceptual content disorder evident.  (*Id.*)  Dr. Poberesky noted that plaintiff's mood was depressed and anxious.  (*Id*.)  He marked her concentration as poor, memory as fair, and her intellectual functioning, judgment, insight, and impulse control as good.  (*Id*.)  He ultimately recommended pharmacotherapy and individualized psychotherapy.  (*Id*. at 503.)

On July 7, 2011, Dr. Poberesky filled out a treatment plan review and diagnosed plaintiff with generalized anxiety disorder, depression, and alcohol abuse in remission.  (*Id*. at 494.)  However, he noted substantial progress towards plaintiff's goal of reducing depression.  (*Id.* at 495.)  He also noted that although plaintiff was not attending "AA" meetings, she continued to maintain her sobriety.  (*Id*. at 496.)

Dr. Poberesky saw plaintiff again on May 19, 2011, noting additional improvements.  (*See id*. at 491.)  He noted her appearance was "good," her mood "euthymic," her affect "appropriate" and "full range," and her form of thought "logical."  (*Id*.)  He noted her cognition was "oriented in all spheres" and that her insight and judgment were both "good."  (*Id*.)  He

---

[6] Interborough is "[a] non-profit outpatient mental health agency."  Interborough Developmental and Consultation Center Home Page, http://www.interborough.org/ (last visited Sept. 8, 2015).

provided similar observations in reports dated June 22, 2011 and on August 3, 2011. (*Id*. at 488, 490.)

### 4. Edward Gold, LCSW[7]

Plaintiff saw Edward Gold, a licensed clinical social worker, for monthly therapy sessions starting in October 2010. (*Id.* at 475.) On July 25, 2011, Gold completed a psychiatric medical report and medical source statement. (*Id.* at 475–81.) Based on plaintiff's self-reporting, Gold checked boxes indicating that plaintiff had extreme limitations understanding and remembering detailed instructions, marked limitations understanding and remembering short, simple instructions and carrying out detailed instructions, moderate limitations carrying out short, simple instructions, and slight limitations in the ability to make judgments on simple work-related decisions. (*Id.* at 479.) He also checked boxes indicating marked limitations interacting appropriately with supervisors and coworkers and responding appropriately to work pressures in a usual work setting, and moderate limitations interacting appropriately with the public and responding appropriately to changes in a routine work setting, again based on plaintiff's self-reporting. (*Id.* at 488.)

Gold's psychiatric medical report noted that although plaintiff was on medication, she still reported anxiety. (*Id.* at 475.) Gold opined that plaintiff's memory was intact, and that she had good insight and judgment. (*Id.* at 476.) He noted that her daily activities included taking her son "to and from school until recently, when back pain forced her to rely on adult son." (*Id.* at 477.) He also noted that plaintiff was able to perform her activities of daily living "with

---

[7] Gold's qualifications are not clear from the record. Dr. Buissereth's report refers to Gold only as a therapist, (Admin. R. at 456), plaintiff's attorney and the ALJ refer to him as "Dr." Gold in the hearing transcript, (*id.* at 111–12), and a Report of Contact from the Administration refers to him as "Edward Gold, LCSW," (*id.* at 219). A WeCARE assessment in 2013 refers to plaintiff's therapist at Interborough as "Eric Gold." (*Id.* at 8.) Gold's own signature in the records provided, including his title, are mostly illegible. (*See id.* at 478.) The defendant's memorandum of law adopts the report of contact's label. (Def.'s Mem. in Supp. at 18.) As plaintiff has not disputed this assertion, the Court accepts defendant's characterization as undisputed.

difficulty due to back pain," and that plaintiff had "a conflicted relationship with family members and friends." (*Id.*) Gold stated that plaintiff would have "assumed difficulty in sustaining concentration and stamina based on self-reported memory problems and pain." (*Id.*) He also noted that plaintiff had reported suicidal thoughts, and that a safety plan was in effect. (*Id.*; *see also id.* at 498–99 (safety plan).)

### III.  Medical Evidence Submitted to the Appeals Council

Plaintiff submitted additional evidence to the Appeals Council. The Appeals Council considered treatment notes from plaintiff's appointment with Dr. Olga Wildfeuer, which it made part of the record and considered. (*Id.* at 5.) The Appeals Council also looked at records from Dr. Nana Aivazi, updated records from Gold, and records from Dr. Denise Harris, but declined to consider these because it concluded that they did not relate to the period prior to the ALJ's decision. (*Id.* at 2.)

#### A.  Dr. Olga Wildfeuer

On December 31, 2011, plaintiff met with Dr. Olga Wildfeuer to discuss test results. (*Id.* at 579–80.) At the meeting, plaintiff complained of insomnia and stress eating, but denied depression or memory problems. (*Id.* at 579.) Dr. Wildfeuer noted that plaintiff usually used a cane but was trying to avoid it. (*Id.*) Dr. Wildfeuer also noted high blood pressure and obesity, and recommended a low-sodium diet and better nutrition. (*Id.*) She prescribed pain and other medication. (*Id.* at 579–80.)

#### B.  Dr. Nana Aivazi

Plaintiff met with Dr. Nana Aivazi, an "Intake – Phase 1 Doctor" for the WeCARE program on May 31, 2013. (*Id.* at 50–66.) Plaintiff reported that she was unable to work due to depression, anxiety, fear of heights and large crowds, and arthritis in her hips and back. (*Id.* at

39, 42, 48.)  Plaintiff was still obese and using a cane.  (*Id.* at 57, 60.)  Dr. Aivazi's physical examination revealed back pain radiating to the lower left leg and bilateral hip pain, with greater pain on plaintiff's left side.  (*Id.* at 56, 60.)  Plaintiff's gait was antalgic, and she "had some difficulty getting on/off [the] exam table."  (*Id.* at 60.)  Dr. Aivazi diagnosed plaintiff with osteoarthrosis and allied disorders, essential hypertension, obesity, and anxiety.  (*Id.* at 64–65.)  She recommended continued outpatient psychiatric care and follow-up by an orthopedist.  (*Id.* at 66.)  Dr. Aivazi opined that plaintiff could "perform her [activities of daily living], and care of her son, but would not be able to tolerate a work environment."  *Id*.

### C.  Edward Gold

In a fax dated December 24, 2012, Gold provided an additional psychiatric medical report and medical source statement.  (*Id.* at 27–32.)  The psychiatric medical report lists the date of last treatment as November 19, 2012, and states that Gold saw plaintiff weekly for therapy and monthly for medication management.  (*Id.* at 28.)  He noted that plaintiff presented panic disorder with agoraphobia and depression.  (*Id.* at 28.)  He described her attitude, appearance, and behavior as "easily angry," her speech, thought organization, and thought content as "constricted," and her mood and affect as "depressed, anxious, [and] angry."  (*Id.*)  Gold described plaintiff's attention and concentration at "poor," her orientation as "adequate," her memory as "poor, fair," and her information and ability perform calculations as "fair."  (*Id.* at 29.)  He also described her insight and judgment as "fair (anger)."

In his medical source statement, Gold marked boxes indicating that plaintiff had no limitations making judgments on simple work-related decisions, mild limitations carrying out simple instructions, moderate limiatations understanding and remembering simple instructions, and marked limitations understanding, remembering, and carrying out completx instructions and

making complex work-related decisions.  (*Id.* at 31.)  He also noted that plaintiff had poor

memory.  (*Id.*)  Gold further noted that plaintiff got irritated easily, and checked boxes indicating

moderate limitations on the ability to act appropriately with supervisors and marked limitations

on the ability to interact appropriately with the public and co-workers, as well as to respond

appropriately to usual work situations in a routine work setting.  (*Id.*)

### D.  Eldene Towey and Denise Harris

Eldene Towey and Denise Harris of WeCARE evaluated plaintiff on May 21, 2013 and

June 13, 2013 respectively.  (*Id.* at 7–18.)  The combined report from their evaluations states that

plaintiff presented with a history of depression, anxiety, agoraphobia, and acrophobia.[8]  (*Id.* at 8.)

Plaintiff also stated that she suffered from a food phobia, believing that her food had been

tampered with or poisoned.  (*Id.*)  She also reported that she needed a hip replacement, suffered

from a herniated disc and arthritis in her back, and high blood pressure and cholesterol.  (*Id.* at

11.)  The report concluded that plaintiff had emotional, interpersonal, and other general non-

exertional work limitations "impaired by psychosis[, . . .] obsessions and compulsions," and

needed continued outpatient psychiatric care.  (*Id.* at 14–15.)

### STANDARD OF REVIEW

### I.    Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is

disabled when reviewing the final determination of the Commissioner.  *See Schaal v. Apfel*, 134

F.3d 496, 501 (2d Cir. 1998).  Rather, the Court "may set aside the Commissioner's

determination that a claimant is not disabled only if the [ALJ's] factual findings are not

supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*,

---

[8] Although Towey and Harris's names appear under "Physician's Name" in the WeCARE report, (*see* Admin. R. at 7, 17), there is no indication from the record as to their precise qualifications.

221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.     Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

[2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

### I.      The ALJ's Determination

Here, the ALJ properly engaged in the five-step analysis and her determinations are supported by substantial evidence.

After first determining that plaintiff had not engaged in substantial gainful activity since June 30, 2010, the ALJ proceeded to step two and determined that plaintiff was severely impaired by generalized anxiety disorder, major depressive disorder, lumbar spondylosis, left hip degenerative joint disease, and alcohol abuse. (Admin. R. at 75.) These findings were based on, and consistent with, the reports and diagnoses from Dr. Poberesky, who treated plaintiff's mental health issues, Dr. Agarwal, who treated her physical ailments, and Dr. Bornstein, who also examined plaintiff. (*See id.* (citing reports of all three physicians).)

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in Appendix 1 of the Administration's regulations. (*Id*. at 75–76.) The ALJ considered plaintiff's mental impairments against listings 12.04 and 12.06 of Appendix 1, which cover "Affective (Mood) Disorders" and "Anxiety Related Disorders," respectively. *See* 20 CFR Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06. To meet or medically equal the impairments of listing 12.04 or 12.06, plaintiff's impairments must satisfy at least two of the following "paragraph B" criteria: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. 20 CFR Part 404, Subpart P, Appendix 1, §§ 12.04(B); 12.06(B). If an impairment fails to satisfy the paragraph B criteria, she may still meet the requirements of listing 12.04 or listing 12.06 if she can meet the criteria listed in paragraph C of each section. Under 12.04(C) she must show a:

> [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Under 12.06(C), a claimant must show that her anxiety results "in complete inability to function independently outside the area of one's home."

Here, the ALJ concluded that plaintiff's impairments did not satisfy the paragraph B criteria. (Admin. R. at 76.) She based her conclusion on plaintiff's own statements about her activities of daily living and social interactions, and on the opinion of consultative examiner Dr. Bornstein. (*Id*.) The ALJ also found that the evidence failed to establish the presence of paragraph C criteria. (*Id*.) In ruling on a claim for disability benefits, an ALJ is "entitled to rely not only on what the record says, but also on what it does not say." *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983).

The ALJ considered plaintiff's physical impairments against listing 1.04 which covers "Disorders of the Spine." 20 CFR Part 404, Subpart P, Appendix 1, § 1.04.

> Under that listing, the claimant must establish a disorder of the spine, resulting in compromise of a nerve root with loss of spinal motion, motor loss, and positive straight-leg raising studies. The claimant may also meet this listing by providing evidence of documented spinal arachnoiditis with attendant symptoms of burning or painful dysthesia, or of spinal stenosis with pseudoclaudication, resulting in ineffective ambulation.

*Smith v. Colvin*, No. 12-CV-5573 (JG), 2013 WL 4519782, at *18 (E.D.N.Y. Aug. 26, 2013). Referring to plaintiff's CT scan[9] results and Dr. Ciati's findings of minimal gait impairment, normal stance, and normal neurological findings, the ALJ concluded that the medical records did not establish findings or symptoms severe enough to qualify under listing 1.04. (Admin. R. at 76–77.)

At step four, the ALJ assessed plaintiff's residual functional capacity ("RFC") and determined that plaintiff could perform light work as defined in 20 CFR 416.967(b), except that she could only stand for one hour at a time for up to two hours a day, walk for one hour at a time for up to two hours a day, and sit for one hour at a time for up to four hours a day. (*Id*. at 77.) The ALJ also found that plaintiff could only understand, remember, and carry out simple tasks,

---

[9] The ALJ erroneously refers to the scan as an MRI; plaintiff could not get an MRI because of the pins in her hip. (Admin. R. at 459.)

maintain attention and concentration for simple work, and work in a low stress environment limited to only occasional decision making and judgment, and where changes only involve work settings procedures and tools. (*Id.*)

The ALJ based her determination in part on her assessment of plaintiff's credibility, as discussed below, as well as her treatment history, her activities of daily living, and her initial reasons for stopping work. (*Id.* at 78.) The ALJ then divided her explanation as to the how additional evidence impacted her RFC assessment between evidence of plaintiff's physical and mental impairments. (*Id.* at 78–79.)

As to plaintiff's physical impairments, the ALJ also considered objective documentary evidence, which showed treatment gaps and improvements in pain, and the CT scan of plaintiff's spine showing "minimal osteophytes, mild facet arthrosis, and minimal diffuse disc bulges, otherwise no other abnormality." (*Id.*) The ALJ also considered the opinions of physicians who examined and treated plaintiff. This includes Dr. Ciati, who provided a consultative examination for the Administration, Dr. Agarwal, who treated plaintiff and to whose opinion the ALJ assigned great weight, and Dr. Pipia, who examined plaintiff on behalf of WeCARE and to whose opinion the ALJ assigned less weight as being inconsistent with the record as a whole. (*Id.* at 78–79.)

As to plaintiff's mental impairments, the ALJ noted that plaintiff's mental health treatment records showed a steady improvement with treatment and plaintiff's report in June 2011 "that she had no medication side effect, was sleeping better, and had no complaints." (*Id.* at 79.) The ALJ also cited to two reports from plaintiff's treating physician, Dr. Pobersky, noting "that claimant presented with a euthymic mood, full range of affect, logical thoughts, no delusions, and good insight and judgment." (*Id.*) In addition, the ALJ considered Dr.

Bornstein's report, to which she assigned significant weight, Gold's report, to which she assigned little weight as it was inconsistent with the findings of both Dr. Bornstein and Dr. Pobersky, and Dr. Burstein's report. The ALJ then completed step four, determining that plaintiff would be unable to perform any past relevant work because she was limited to light unskilled work. (*Id*. at 81.)

At step five, the ALJ took note of plaintiff's age, education, and English proficiency. (*Id*. at 81.) *See also* 20 CFR Part 404, Subpart P, Appendix 2, § 202.21. The ALJ acknowledged that plaintiff was unable to perform all or substantially all of the requirements of "light work," as reflected in her RFC assessment. (Admin. R. at 81.) Then, based on the VE's testimony and her own review of the Dictionary of Occupational Titles, she identified three occupations at the "sedentary exertional level" and concluded that plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the national economy and was therefore not disabled under the SSA.

The ALJ therefore properly followed the five step analysis required by law, and each of her conclusions during that process was supported by substantial evidence in the record.

## II.     The Treating Physician Rule

The regulations controlling an ALJ's credibility determination provide criteria that the ALJ must consider in assigning credibility to a medical assessment. 20 C.F.R. § 404.1527(c). The ALJ generally affords greater weight to the opinions of treating sources than those of consultative professionals or sources that have not examined the claimant, *id.* § 404.1527(d)(2), and an ALJ must give a treating physician's opinion on the nature and severity of a claimant's impairment *controlling* weight "if it is 'well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.'" *Snell v. Apfel*, 177 F.3d

128, 133 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1527(c)(2)).  This is known as the "treating physician rule."  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).  A treating physician is one who provides, or has provided, the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502. However, "[w]hile the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record."  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (internal citations omitted). "Genuine conflicts in the medical evidence are for the [ALJ] to resolve."  *Id.* (citing *Richardson*, 402 U.S. at 399).

The ALJ considered conflicting opinions from two physicians who treated plaintiff's physical impairments – Dr. Agarwal, a spine specialist, and Dr. Pipia, a physical medicine and rehabilitation specialist.  Although the ALJ states that she accorded "great weight" to Dr. Agarwal's opinion, as defendant notes, the ALJ's RFC determination essentially treats Dr. Agarwal's opinion as controlling, incorporating the conclusions in his July 14, 2011 medical source statement undisturbed.  (Compare *id*. at 77, *with id*. at 467–68.)  In contrast, the ALJ accorded "less weight" to treating physician Dr. Pipia's opinion because, in her view, it was "not consistent with the record."  (*Id*. at 79.)  In addition to Dr. Agarwal's opinion, the ALJ also discussed Dr. Caiati's observations, which are more consistent with Dr. Agarwal's assessment than Dr. Pipia's.  (*Id.* at 78.)  Dr. Caiati stated that plaintiff "was in no acute distress, although she had minimal gait impairment of her left side[,] . . . that she was able to walk on her heels and toes with mild difficulty[,] . . . needed no help changing for the exam or getting on and off the table[, and] . . .was able to rise from the chair with minimal difficulty."  (*Id.*)  As Dr. Pipia's opinion was contradicted by other evidence in the record, including the opinion of another

treating physician, the ALJ's decision to give less than controlling weight to Dr. Pipia's opinion was supported by substantial evidence.

As to plaintiff's mental impairments, the ALJ considered the opinion of plaintiff's two treating sources, Dr. Poberesky and Gold. Although the ALJ did not expressly assign a specific "weight" to Dr. Poberesky's conclusions, her opinion appears to accept them at face value. Specifically, the ALJ credited Dr. Poberesky's June 2011 report that plaintiff "presented with a euthymic mood, full range of affect, logical thoughts, no delusions, and good insight and judgment" – conclusions that were repeated following an August 2011 meeting between plaintiff and Dr. Poberesky. (*See id.* at 79.) The ALJ did not discount any of Dr. Poberesky's conclusions, and even limited the weight accorded to another source's opinion in part because it was inconsistent with Dr. Poberesky's. (*Id.* at 80.)

The ALJ also did not give controlling weight to Gold's medical source statement. (Admin. R. at 80.) Defendant asserts that the treating physician rule does not apply here because the opinion is that of a social worker and not a "medical opinion." (Def.'s Mem. in Supp. at 33.) However, courts in this Circuit have concluded that the treating physician rule applies to the opinions of licensed social workers, like Gold. *See Jacobi v. Colvin*, No. 14-CV-3827 (PAE) (JCF), 2015 WL 4939617, at *10 (S.D.N.Y. Aug. 19, 2015) (citing *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y 2010)). Regardless, the ALJ's decision to discount the opinion is supported by substantial evidence, even under the treating physician rule.

Gold's July 2011 medical source statement asserts that plaintiff has extreme restrictions in her ability to understand and remember detailed instructions; marked restrictions in her ability to understand, remember, and carry out short, simple instructions, to make judgments on simple work-related decisions, to interact with supervisors and coworkers, and to respond appropriately

to work pressures in a usual work setting; and moderate restrictions in her ability to interact appropriately with the public. (Admin. R. at 479–80.) Gold wrote that his assessment was supported by plaintiff's "self-reporting of frequent altercations with friends and family members." (*Id.* at 480.) However, as the ALJ noted, Gold's conclusions are inconsistent with those of plaintiff's other treating physician, Dr. Pobereksy, as well those of consultative examiner Dr. Bornstein. (*Id*. at 80.)

The ALJ acted within her discretion to resolve genuine conflicts in the medical evidence, as her decisions to assign less than controlling weight to the opinions of Dr. Pipia and Gold were supported by substantial evidence. *See Veino*, 312 F.3d at 588.

### III.    The ALJ's Credibility Determination

The ALJ must analyze the credibility of a claimant as to her symptoms through a two-step test. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must first decide "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Next, if the ALJ determines the claimant does have such an impairment, she must consider "'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(a) (alternations omitted)). Other evidence of record that the ALJ must consider includes:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

*Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R.

§ 404.1529(c)(3)). "While it is not sufficient for the ALJ to make a single, conclusory statement

that the claimant is not credible or simply recite the relevant factors, remand is not required

where the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility]

decision." *Cichocki v. Astrue*, 534 Fed. App'x. 71, 76 (2d. Cir. 2013) (quoting *Mongeur v.

Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) (internal quotation marks omitted). In such a case,

"the ALJ's failure to discuss those factors not relevant to [her] credibility determination does not

require remand." *Id.*

At step one of the inquiry, the ALJ found that plaintiff's medically determinable

impairments could reasonably be expected to cause the alleged symptoms. (Admin. R. at 78.)

At step two of the inquiry, however, the ALJ found that plaintiff's statements regarding the

intensity, persistence, and limiting effects of her symptoms were not entirely credible, stating

that "she is limited by her impairments, but not to the extent alleged." (*Id.*)

In making her determination the ALJ addressed plaintiff's complaints of difficulty

walking, standing, climbing stairs, and concentrating as well as her daily activities, which

included taking her son to and from school, going to a substance abuse program, relaxing at

home, preparing meals and travelling independently by public transportation. (*Id.*) The ALJ

also considered plaintiff's treatment history and medication use. (*Id.*) The ALJ noted that

plaintiff's treatment history reveals gaps in her physical therapy attendance along with

improvements during those times she regularly attended. (*Id.* at 78; *see also, e.g.*, 458–66

(recording plaintiff's pain as a "9/10" in August 2010, a "7/10" in September 2010, and "5/10" in

October 2010, and noting her participation in physical therapy in each of those reports), *id.* at

526–33 (recording plaintiff's pain as going from and a "9/10" to a "2/10" while engaged in

physical therapy from December 9, 2009 until January 16, 2010)).  As noted above, the ALJ also gave significant, if not controlling, weight to the opinions of Dr. Agarwal and Dr. Poberesky, who treated plaintiff, but whose opinions also led the ALJ to conclude that she was not disabled. (*See id*. at 78–80; *see also* 472, 488–91.)  The ALJ also reviewed objective medical evidence, such as the 2010 CT Scan, which revealed "minimal osteophytes, but otherwise no abnormality." (*Id*. at 79, 486.)  In addition, the ALJ considered plaintiff's limited work history, although she concluded that it neither enhanced or detracted from her credibility because it was so remote. (*Id.* at 78.)  However, she did note that plaintiff initially stopped working to care for her son, not because of her impairments.  (*Id.*)

Thus, the ALJ's determination that plaintiff was not entirely credible regarding the intensity of her symptoms was supported by substantial evidence in the record.

**IV.    New Evidence Submitted to Appeals Council**

The regulations direct the Appeals Council to consider "new and material evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied and probative.'"  *Sistrunk v. Colvin*, No. 14-CV-3208 (JG), 2015 WL 403207, at *7 (E.D.N.Y. Jan. 28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)).  "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'"  *Id.* (quoting *Jones*, 949 F.2d at 60).

Plaintiff submitted four new medical reports to the Appeals Council. The Appeals Council considered Dr. Wildfeuer's report, but declined to consider the other three reports, concluding they did not relate to the period prior to the ALJ's decision. (Admin. R. at 1–2, 5.)

The Appeals Council concluded Dr. Wildfeuer's report did not provide any basis to disturb the ALJ's decision. The Court agrees that the new information was not material insofar it can ascertain no basis under which the ALJ would have decided plaintiff's claim differently had she reviewed this report. The Court also agrees with the Appeals Council's determination that the other reports did not relate to the period prior to the ALJ's decision. None of these reports opine on the nature of any plaintiff's symptoms prior to May 24, 2012, and to assume that any of the symptoms described in the reports were present at the intensity described before that point would require pure speculation. The Appeals Council therefore did not err in declining to consider these reports.

## CONCLUSION

For the reasons herein, defendant's motion for judgment on the pleadings is GRANTED and the case is DISMISSED. The Clerk of Court is respectfully directed to enter the accompanying judgment, to mail a copy of this Memorandum and Order and accompanying judgment to plaintiff, and to close this case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
        September 22, 2015

_____
ROSLYNN R. MAUSKOPF
United States District Judge